**McArthur JONES, Appellant,**

v.

**Edward J. DERWINSKI, Secretary of Veterans Affairs, Appellee.**

**No. 90–58.**

United States Court of Veterans Appeals.

Argued Oct. 12, 1990.

Decided April 10, 1991.

Hearing En Banc Ordered Nov. 22, 1991.

William G. Smith, Los Angeles, Cal., for appellant.

Thomas A. McLaughlin, with whom Raoul L. Carroll, Gen. Counsel, Barry M. Tapp, Asst. Gen. Counsel, and Pamela L. Wood, Deputy Asst. Gen. Counsel, Washington, D.C., were on the brief, for appellee.

Before NEBEKER, Chief Judge, and IVERS and STEINBERG, Associate Judges.

STEINBERG, Associate Judge:

On October 10, 1989, the Board of Veterans Appeals (BVA or Board) issued a decision on a reopened claim by the appellant,

McArthur Jones, for service-connected disability compensation for chronic prostatitis. The BVA concluded that its prior "denial of entitlement ... in January 1988 is a final determination; and the evidence received subsequently does not present a new factual basis for a grant of service connection...." *McArthur Jones,* loc. no. 929115, at 8 (BVA Oct. 10, 1989).

The issue is whether certain material findings of fact by the BVA in its October 10, 1989, decision should be held unlawful and set aside because they are "clearly erroneous" under 38 U.S.C. § 4061(a)(4) (1988). We hold that they are not but that remand of the case to the Board is required because the decision fails to provide adequate "reasons or bases" for certain findings of material fact and conclusions of law. We also address the standard of review that the Department of Veterans Affairs (VA or the Department) is required by 38 U.S.C. §§ 4004(b) and 3008 (1988) to apply to a reopened claim.

A second major issue was presented in this appeal pertaining to the payment of attorney fees to the veteran's attorney for services rendered in representing the veteran before VA, the BVA, and this Court. Those attorney-fee issues have been separated from the substantive appeal and redocketed in a separate case, *In the Matter of the Fee Agreement of William G. Smith in Case Number 90–58,* U.S.Vet. App. No. 91–619 (Notice of Appeal filed Feb. 2, 1990), as an appeal by the appellant's attorney, William G. Smith, Esquire, from the BVA's decision on the fees provided for in a fee agreement between the attorney and the appellant. Those issues are still under submission. In the future, in view of the possibility that an attorney and an appellant may not have an identity of interests on attorney-fee questions, the Court will, at the outset of the appeal, very likely separate attorney-fee issues from issues in the substantive appeal, so that the issues will be separately considered.

## I. BACKGROUND

Mr. Jones served in the Army from July 1965 to June 1968, including service in Germany. His 1965 Army enlistment examination did not indicate any medical problems. He first sought treatment from the Army on August 15, 1966, for urethral discharge, mild dysuria, and painful urination. On several occasions over the next four months, he sought Army treatment in Germany for these urinary problems, as well as frequency of urination (*see* the first seven paragraphs of the Appendix to this opinion); on January 7, 1967, an Army treating physician concluded that the veteran's "complaints [had] subsided" and made a final diagnosis of "prostatitis-cystitis". R. at 18. There is no record of any other medical complaints for the remaining 17 months of his service; however, the veteran testified under oath at a February 16, 1989, hearing at the Regional Office (RO) of the Veterans' Administration (the VA), the predecessor of the Department, that he was able to control his urinary problem in service by drinking less fluid. R. at 123.

In March 1987, the veteran first applied for compensation from the VA for a urinary problem. In support of his claim, he submitted medical records showing private treatment of, among other conditions, urinary discharge, urgency, and frequency over the 15 years from 1972 to 1987. (*See* the Appendix.) A medical examination by the VA in May 1987 assessed his problem as either "possible neurogenic bladder, or possible chronic interstitial cystitis." R. at 42. On January 26, 1988, the BVA denied service connection based on its findings that the "various genitourinary symptoms [treated] while on active duty ... resolved without chronic residuals prior to separation from the service" and that "medical finding[s] suggestive of chronic pathology of the urinary tract first appear[ed] *several years after discharge from the service.*" *McArthur Jones,* loc. no. 801647, at 4 (BVA Jan. 26, 1988) (emphasis added). This decision was not appealable to this Court because the Notice of Disagreement pertaining to the claim was filed prior to November 18, 1988. *See* Veterans' Judicial Review Act (VJRA), Pub.L. No. 100–687, Div. A, § 402, 102 Stat. 4105, 4122 (1988); *Skinner v. Derwinski,* 1 Vet.App. 2 (1990).

In February 1988, the veteran reopened his claim at the RO on the basis of his submission of "new and material evidence". R. at 100. *See* 38 U.S.C. §§ 3008, 4004(b) (1988). He submitted previously omitted outpatient medical records from the VA that showed treatment for urgency, frequency, and prostatitis by the VA between May and November 1987; an April 1988 medical report from a private physician stating that it was "within reasonable doubt that the condition which he has currently may at first have appeared during the time the patient was in active duty in 1966–1968"; and an April 1988 medical report from another private physician stating that the appellant had a "long standing problem of chronic prostatitis with acute exacerbation." R. at 101–105, 107, 112. The remainder of the new evidence submitted was the veteran's testimony under oath at the February 16, 1989, personal hearing that he had been treated for urinary frequency by a physician in Vicksburg, Mississippi, within six months after discharge from service and in Los Angeles, California, in either late 1969 or early 1970. R. at 118, 120, 122.

The RO denied the reopened claim on December 23, 1988, and on October 10, 1989, the BVA affirmed the RO's denial. A timely appeal to this Court followed. Jurisdiction here is founded on 38 U.S.C. § 4052 (1988).

## II. ANALYSIS

### A. *Reopening a Claim*

38 U.S.C. § 4004(b) (1988) provides:

*Except as provided in section 3008 of this title, when a claim is disallowed by the Board, the claim may not thereafter be reopened and allowed and a claim based upon the same factual basis may not be considered.*

(Emphasis added.) 38 U.S.C. § 3008 (1988) provides:

If new and material evidence is presented or secured with respect to a claim which has been disallowed, the [Secretary] shall reopen the claim and

review the former disposition of the claim.

■ Under section 3008, when a claimant seeks a reopening of his or her claim by submitting what is asserted to be "new and material" evidence, a "two-step analysis" must be performed: if the evidence is determined by the regional office or the BVA to be "new and material", the claim is to be reopened; then a review is made to determine whether the former disposition of the claim should be altered. *Manio v. Derwinski*, 1 Vet.App. 140, 145 (1991).

As to the first step, the parties agree that new and material evidence was submitted by the claimant. At oral argument, counsel for the Secretary acknowledged that the evidence submitted was considered by the BVA to be new and material. In its decision, the BVA did seem to concede that new and material evidence had been submitted.

■ As was suggested in *Manio*, at 145, and later held in *Colvin v. Derwinski*, 1 Vet.App. 171, 173 (1991), the question of whether newly submitted evidence is "new and material" under section 3008 is a question of law. *Accord Smith v. Derwinski*, 1 Vet.App. 178, 179 (1991). In the instant case we hold that the evidence submitted by the appellant was, in law, "new and material". The primary basis for the BVA's denial of service connection for the veteran's current urinary problems was the 44–month gap between his discharge from service and his first treatment at Kaiser Permanente for these problems in March 1972. *McArthur Jones*, loc. no. 929115, at 7 (BVA Oct. 10, 1989). The veteran's sworn testimony that he had twice sought treatment for his urinary problems from physicians during that time, if believed, was both new and material.

That being so, the questions are: (1) what standard for the section 3008 review is to be applied to the reopened claim, and (2) was the correct standard applied here. The RO (R. at 116) and the BVA (*McArthur Jones*, loc. no. 929115, at 6 (BVA Oct. 10, 1989)) were applying a pre–VJRA regulation which required that if new and mate-

rial evidence is submitted then the claim may be granted only if that new evidence provides a "new factual basis for allowing the claim". 38 C.F.R. § 19.194 (1990). This regulation has now, in effect, been superseded, effective January 22, 1991, by a regulation promulgated to provide "a formal regulatory definition" for the term "new and material evidence" contained in section 3008 which was added by section 103 of the VJRA. 55 Fed.Reg. 19,088 (May 8, 1990) (supplementary information on proposed rule). The new regulation defines "new and material evidence" as follows:

"New and material evidence" means evidence not previously submitted to agency decisionmakers which bears directly and substantially upon the specific matter under consideration, which is neither cumulative nor redundant, and which by itself or *in connection with evidence previously assembled* is so significant that it must be considered in order to fairly decide the merits of the claim.

55 Fed.Reg. 52,274 (Dec. 21, 1990) (codified at 38 C.F.R. § 3.156(c) effective Jan. 22, 1991) (emphasis added). Although this new regulation is a definition of "new and material evidence" for the purpose of determining *whether or not* the claim is to be reopened, the underlined language in the above quotation clearly implies that the standard for the review to be carried out once the claim is reopened includes the same criterion—that the new evidence be considered "by itself or in connection with evidence previously assembled".

In its October 10, 1989, decision, the BVA presented "THE ISSUE" as "whether additional evidence establishes a new factual basis warranting service connection for a bladder/urinary condition." *McArthur Jones*, loc. no. 929115, at 1 (Oct. 10, 1989). In its "DISCUSSION AND EVALUATION", the BVA stated: "The issue for consideration, therefore, is whether the evidence received *since that determination* establishes a new factual basis warranting a grant of service connection for the disability"; and: "The evidence *submitted since* the prior decision of the Board ... does not establish ... a chronic uri-

nary/bladder disability...." *Id.* at 7 (emphasis added). In its "CONCLUSION OF LAW", the BVA stated that the denial "in January 1988 is a final determination; and the evidence *received subsequently* does not present a new factual basis for a grant of service connection for a urinary/bladder condition." *Ibid.* (emphasis added).

Exactly what standard the BVA applied for its review is not entirely clear. While framing the issue as quoted above, the BVA also reiterated the "old" evidence for two pages and then made two statements that might derive from an evaluation of all the evidence, new and old: "There is simply no evidence of record which persuavsively [sic] associates the veteran's current chronic genitourinary disability with his period of active duty.... The evidence of record does not raise a reasonable doubt or otherwise warrant allowance of this claim." *Ibid.* On the whole, however, we find that the very clear statements of the issue at the outset and in the "CONCLUSION OF LAW" and twice in between are the best indication of the standard applied by the BVA, and that standard was whether the new evidence *alone* established a sufficient basis for granting service connection in this case.

At oral argument, counsel for the Secretary conceded that section 3008 requires that "when new and material evidence is received it should be viewed in conjunction with the other evidence." We agree. *See Manio*, at 145. The new regulation demonstrates what the Department acknowledged at oral argument—that it would be impossible for either a regional office or the BVA to "review the former disposition of the claim", that is, to decide the merits of a reopened claim fairly, without looking at the new and material evidence in the context of all the other evidence of record and not in isolation. *See* 38 U.S.C. § 4004(a) (1988) ("Decisions of the Board shall be based on the entire record in the proceeding and upon consideration of all evidence and material of record ..."); *Colvin*, at 172 (when claim is reopened because the evidence submitted is found to be new and material, that evidence is to be con-

sidered "in the context of the other evidence in order to review the former disposition" of the claim).

There is no indication whatsoever that in enacting section 3008 Congress intended that a reopened claim could be allowed only when the new and material evidence was of such significance that standing alone it might reasonably be found to dictate allowance of the claim. *See* VJRA, Pub.L. No. 100–687, § 103(a), 102 Stat. at 4107 (1988); 134 Cong.Rec. S16653 (daily ed. Oct. 18, 1988) (Explanatory Statement on the Compromise Agreement on S. 11, As Amended, the ["VJRA"] ). Indeed, the legislative history is to the contrary.

The phrase "new factual basis for allowing the claim" in the old regulation derived from the language in section 4004(b) that *"when a claim is disallowed,* the claim may not thereafter be reopened and allowed and *a claim based upon the same factual basis may not be considered."* 38 U.S.C. § 4004(b) (1988) (emphasis added). However, in the VJRA, Congress added at the outset of section 4004(b) a qualifier, "Except as provided in section 3008", and enacted a new section 3008. VJRA, Pub.L. No. 100–687, §§ 103, 204, 102 Stat. at 4107, 4111 (1988). Under section 3008, when a claim is sought to be reopened based on "new and material evidence" and the evidence submitted is found to be new and material, the Department is to "reopen the claim and review the former disposition of the claim." 38 U.S.C. § 3008 (1988). The addition of this qualifying phrase to the section 4004(b) language quoted above evidences Congressional intent that that language not have further applicability to a reopening at the regional office level based on the submission of new and material evidence. This question is essentially mooted, however, by the clear implication in the new regulation of the standard for the review to be applied in reopened cases considered at the regional office level or the BVA after January 21, 1991. Since we are remanding the case to the BVA for readjudication, we need not here decide whether the continued application of the old regulation was consistent with the stat-

utory changes made by the VJRA. The new regulation will be applied on remand.

Under section 3008 and the new regulation, it is the regional office's and the BVA's responsibility to determine whether the new evidence makes a difference in the outcome. In the words of the statute, the issue is, does "review" of that evidence in the context of the evidence already of record justify a change in "the former disposition of the claim"? 38 U.S.C. § 3008 (1988). Since the prior evidence of record established without dispute a continuity of symptomatology from 1972 to the time of the claim, the question under section 3008 should thus have been whether the new evidence filled the gap in the evidence of continuity from the veteran's discharge in June 1968 until the veteran consulted Kaiser in March 1972.

Instead, the BVA concluded that the reopened claim should be denied because the new evidence, standing alone, "[did] not establish a chronic urinary/bladder disability" or "present a new factual basis for a grant of service connection...." *McArthur Jones,* loc. no. 929115, at 7–8 (BVA Oct. 10, 1989). Because we are not satisfied that this was the correct standard to be applied under section 3008, we must vacate the decision and remand the case to the BVA for it, under the new regulation, to assess the new and material evidence in the context of the other evidence of record and make new factual determinations as to whether the 44–month "gap" has been filled adequately by the new evidence.

### B. *"Clearly Erroneous" Standard of Review*

38 U.S.C. § 4061(a)(4) (1988) provides:
In any action ... the Court of Veterans Appeals, to the extent necessary to its decision and when presented, shall in the case of a finding of material fact made in reaching a decision in a case before ... [the Department], hold unlawful and set aside such finding if the finding is *clearly erroneous.*
(Emphasis added.)

This Court expounded upon this standard in *Gilbert v. Derwinski,* 1 Vet.App. 49, 52

(1990), quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948), as follows: " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed.' " To provide further explanation of the standard, *Gilbert* quoted *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985), as follows:

"If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 [70 S.Ct. 177, 179, 94 L.Ed. 150] (1949); *see also Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 [102 S.Ct. 2182, 72 L.Ed.2d 606] (1982)."

*Gilbert*, at 52.

■ As discussed in *Gilbert*, the legislative history of the VJRA clearly demonstrates that Congress intended the "clearly erroneous" standard applicable to fact review in Article III courts of appeals to be applied by this Court in reviewing BVA findings of material fact. *Id.* at 52. In sum, "under the 'clearly erroneous' rule this Court is not permitted to substitute its judgment for that of the BVA on issues of material fact; if there is a 'plausible' basis in the record for the factual determination of the BVA even if this Court might not have reached the same factual determinations, we cannot overturn them." *Ibid.*

■ Under applicable Department regulations, when a condition is not shown to be chronic in service, service connection for a chronic disease, such as chronic prostatitis, is established by a showing of continuity of symptomatology after service. 38 C.F.R. § 3.303(b) (1990). That regulation does not require that the exact same diagnosis be made in service and after service—in the present case the diagnosis in service was "prostatitis-cystitis" (R. at 18) and the present diagnosis is "chronic prostatitis" (R. at 112). Rather, the regulation requires continuity of symptomatology in order to provide a linkage between the in-service and post-service diagnoses.

The appellant contends that the BVA's finding regarding a lack of continuity of symptomatology is clearly erroneous. But for one aspect of the evidence, the credibility of the claimant's sworn testimony, this Court would agree. (For the reasons he will set forth at the conclusion of this opinion, the author judge does find clearly erroneous the BVA's finding that continuity of symptomatology for chronic prostatitis was not established by the new evidence when added to the old evidence of record.)

In its October 10, 1989, decision, the BVA stressed three times in the course of seven sentences the critical nature of what it viewed as a 44–month post-service gap in the appellant's continuity of symptomatology. Specifically, the BVA found that "medical findings suggestive of chronic pathology of the urinary tract first appeared several years after discharge ..."; that "the [newly submitted] evidence ... does not establish that a chronic urinary/bladder disability was present [until] several years following separation ..."; and that "the first demonstrable evidence of possible chronic genitourinary disability dates to 1972, several years after separation...." *McArthur Jones*, loc. no. 929115, at 7 (BVA Oct. 10, 1989).

In order to fill this gap and the 17–month in-service absence of any record of medical care for the urinary problems, the veteran offered as part of his new and material evidence his sworn February 16, 1989, RO hearing testimony that he had sought treatment for "frequent urination" from a private physician in Mississippi within six months after his discharge and that he had sought treatment for the same condition from a private physician in Los Angeles in either late 1969 or early 1970. He further testified under oath that by drinking less

fluids he had been able to control the "urgency and frequency" urinary problem for the last 17 months of his service.

As we have held in part II.A., above, in reviewing "the former disposition of the claim" as part of a reopening under section 3008 this sworn testimony must be evaluated in the context of (a) the appellant's medical condition in service, as demonstrated by his undisputed medical records, (b) the 15 years of undisputed medical records from Kaiser Permanente through 1987, (c) the newly submitted undisputed 1987 VA outpatient medical records, and (d) the newly submitted reports of the private physicians. (*See* the Appendix for a detailed listing of the extensive medical entries in the record.)

■ In *Gilbert,* we remanded the case in part because the BVA decision contained "neither an analysis of the credibility or probative value of the evidence submitted by or on behalf of the veteran in support of his claim nor a statement of the reasons or bases for the implicit rejection of this evidence by the Board." *Gilbert,* at 59. (*See* the discussion of the "reasons or bases" statement requirement in 38 U.S.C. § 4004(d)(1) in part II.C., below.) If the appellant's testimony is found credible in the present case, then, under the "clearly erroneous" standard for our appellate review of BVA fact determinations, we would have the requisite "definite and firm conviction" that this testimonial evidence, when added to the rest of the new and old evidence, demonstrates that the veteran had, indeed, continuously experienced and sought treatment for the last 22 years for many of the same symptoms he experienced in service. However, the majority here is of the view that the assessment of the credibility of the veteran's sworn testimony is a function for the BVA in the first instance and that it is not for this Court to find (as the author Judge would do for the reasons stated at the end of this opinion) that that sworn testimony, under the circumstances of this case, is credible. That issue will thus be remanded to the Board with a direction to make a specific determination as to the credibility of the veteran's testimony and to provide a statement of the reasons or bases for that determination.

### C. "Benefit of the Doubt" and Statement of "Reasons or Bases"

Two other critical statutory requirements, as also explicated in *Gilbert,* must be discussed in order to decide this case. Under 38 U.S.C. § 3007(b) (1988), "after consideration of all evidence and material of record in a case" before the Department, if there is "an approximate balance of positive and negative evidence" regarding an issue, the Department and the BVA are to give the claimant "the benefit of the doubt" in resolving the issue. In *Gilbert,* at 53, we explained the effect of section 3007(b) by concluding, as counsel for the Secretary had agreed in oral argument of that case, that "the preponderance of the evidence must be against the claim for benefits to be denied."

Under 38 U.S.C. § 4004(d)(1) (1988), a "decision of the Board shall include a written statement of the Board's findings and conclusions, and the reasons or bases for those findings and conclusions, on all material issues of fact and law presented on the record...." We held in *Gilbert,* at 56, that a "bare conclusory statement [by the BVA], without both supporting analysis and explanation, is neither helpful to the veteran, nor 'clear enough to permit judicial review', nor in compliance with statutory requirements." We further held that under sections 3007(b) and 4004(d)(1) combined, the BVA opinion must include "an evaluation of the 'positive' evidence ... [and] a weighing of the 'positive and negative' evidence ... [and] a § 4004(d)(1) statement of the 'reasons or bases' for ... [a] conclusion that the 'benefit of the doubt' doctrine does not apply." *Id.* at 59. We also held there, as noted in part II.B., above, that the BVA decision must contain "an analysis of the credibility or probative value of the evidence submitted by or on behalf of the [claimant] ... [and] a statement of the reasons or bases for ... rejection of this evidence by the Board." *Id.* at 59.

■ In the present case, the October 10, 1989, BVA decision failed to comply with either section 4004(d)(1) or section 3007(b) as construed in *Gilbert.* The decision runs afoul of section 4004(d)(1) and *Gilbert* because the decision fails to contain a statement of "reasons or bases" to support its assertion that "[t]he evidence submitted since the prior decision of the Board ... does not establish that a chronic urinary/bladder disability was present during service or for several years following separation therefrom." *McArthur Jones,* loc. no. 929115, at 7 (BVA Oct. 10, 1989). As indicated in part II.B., above, the decision is further deficient in failing to provide the Board's reasons or bases for its implicit rejection of the veteran's sworn testimony. The BVA decision is deficient under section 3007(b) and *Gilbert* because it contained only a "bare conclusory statement" (*Gilbert,* at 57) that "[t]he evidence of record does not raise a reasonable doubt or otherwise warrant allowance of this claim." *Id.* at 215.

## III. CONCLUSION

In view of the above discussion, we vacate the BVA decision, retain jurisdiction, and remand the record to the BVA for readjudication in three specific respects: For the BVA (1) to assess under section 3008 the new and material evidence in the context of all of the evidence in the case and to state the "reasons or bases" for its assessment as to whether the new evidence fills the evidentiary gap with regard to continuity of symptomatology; (2) to state its "reasons or bases" if it again determines that the benefit-of-the-doubt standard under section 3007(b) is inapplicable to its assessment of the new evidence in the context of the old evidence of record, particularly its reasons or bases for concluding that the preponderance of the evidence is against the claim; and (3) to evaluate the appellant's evidence, including assessing the credibility of his February 16, 1989, sworn testimony, to weigh the positive and negative evidence, and to provide the Board's "reasons or bases" for its findings and conclusions in these respects.

VACATED AND REMANDED.

## IV. SEPARATE VIEWS

The author judge would go further than the majority, and would hold unlawful and set aside as clearly erroneous under 38 U.S.C. §§ 4061(a)(4) and 3007(b) two dispositive BVA findings of material fact in the October 10, 1989, BVA decision. These findings are: (1) that the new and material evidence when considered in the context of the old evidence of record does not establish continuity of symptomatology; and (2) that the appellant's current chronic genitourinary disability is not associated with the urinary condition he experienced in service. In my view, the only "plausible" reading of the new and material evidence submitted at the time the claim was reopened, when viewed, as required by 38 U.S.C. § 3008, in the context of all of the other evidence of record (summarized in the Appendix), is that continuity of symptomatology is shown overwhelmingly by the new and old evidence in a way that establishes, as a matter of law, service connection for chronic prostatitis under 38 C.F.R. § 3.303(b) (1990). Hence, I would also conclude that the implicit conclusion that the evidence on the issue of service connection is not at least in equipose is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law under 38 U.S.C. § 4061(a)(3)(A)." *See Gilbert,* at 51.

The BVA decision offered no "reasons or bases" (as required by 38 U.S.C. § 4004(d)(1), discussed above) for not accepting the veteran's sworn testimony as credible. Nor did it or the hearing examiner state that the testimony was not, in fact, credible. Rather, the BVA totally ignored the specifics of the veteran's sworn testimony about seeking treatment shortly after service and limiting intake of fluid in service. There is no reference whatsoever to that testimony in the "DISCUSSION AND EVALUATION" portion of the BVA decision; nevertheless, the BVA found that the "evidence submitted since the prior decision ... [did] not establish that a chronic urinary/bladder disability was present during service *or for several years following*

*separation therefrom."* McArthur Jones, loc. no. 929115, at 7 (BVA Oct. 10, 1989) (emphasis added).

The only mention of the veteran's hearing testimony in the BVA decision is as follows: "[T]he veteran testified in February 1989 before a hearing officer at the [RO]. His testimony was essentially consistent with the 'CONTENTIONS' supra." *McArthur Jones,* loc. no. 929115, at 5 and 2 (BVA Oct. 10, 1989). The BVA summarized the veteran's contentions as follows: "It is contended, in essence, that service connection is warranted for the veteran's bladder/urinary condition.... The veteran maintains that he has received regular treatment for his condition since leaving military service. It is further maintained that there is substantial proof to support the veteran's contentions." *Id.* at 2.

Since the BVA made no finding that the veteran's testimony is lacking in credibility and said nothing even suggesting such a finding and because I cannot conceive of a basis that I would find "plausible" for rejecting that testimony, I would accept it in light of the substantial corroboration afforded it by the other extensive and undisputed evidence of record, new and old, regarding the continuity of symptomatology. I believe and the majority agrees, that the record demonstrates beyond contradiction that the appellant sought treatment from 1972 to 1988 for many of the same symptoms from which he suffered in service. We are all also in agreement that the evidence of total continuity of symptomatology in this case is completed by the veteran's sworn testimony *if* it is not discredited.

In my view, the surrounding circumstances lend great credence to the veteran's testimony. The Kaiser Permanente records of continuous treatment from 1972 to 1987 (summarized in the Appendix) exist because they were maintained by a large, well-established, centralized health organization with the resources and continuity to maintain such records. It is understandable that the veteran would not be able to obtain records of treatment provided before he began receiving care from Kaiser or the VA facilities, since such prior treatment would have been sought well over 20 years ago from private physicians with whom he had no reason to remain in contact once he began receiving care from Kaiser almost 20 years ago in 1972.

Corroboration of the veteran's sworn testimony about seeking treatment during the period between discharge from service and commencement of treatment from Kaiser might be expected to be found in the report of a medical history taken when he began his treatment with Kaiser in 1972. Unfortunately, no such medical history is contained in the Kaiser records that are a part of the record on appeal. R. at 29–36, 46–94.

As I view the impact of the new evidence on the old and undisputed evidence, a remand to the BVA is pointless. Rather, I would set aside the findings of material fact and reverse the decision of the Board on the issue of service connection. Avoiding a fruitless remand for superfluous fact-finding is an action for which support may be found in Supreme Court decisions where the Court reached out to decide the ultimate question even though it had not been properly addressed in the lower courts. "We need not remand for that purpose [to obtain a correct weighing and balancing of competing considerations by the lower court(s) ], however, because the outcome is readily apparent from what has been said above." *Bigelow v. Virginia,* 421 U.S. 809, 826–27, 95 S.Ct. 2222, 2235, 44 L.Ed.2d 600 (1975); *see also Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 612 n. 20, 98 S.Ct. 1306, 1319 n. 20, 55 L.Ed.2d 570 (1978) (quoting *Bigelow* with approval and applying it).

### APPENDIX

A. The appellant first sought treatment at the U.S. Army Hospital in Muenchweiler, Germany, on 8/15/66. At that time, it was noted he had been suffering "urethral discharge and mild dysuria for 3 days." Painful urination was also noted. (R. at 7.) He continued to seek and receive treatment at the hospital until 1/7/67, as follows:

The 9/3/66 "chronological record of medical care" noted "some dysuria and mild pain...." R. at 9.

The 11/9/66 "record" noted that the appellant "can't hold his water × 3 day[s]". R. at 9.

Another 11/66 (day unreadable) notation reported "recurrence of frequency—no dysuria". R. at 9.

On 12/8/66, it was recorded that the appellant "still has frequency ..., nocturia × 4". R. at 12.

At a 12/21/66 neurology consultation, it was noted that the appellant "has had freq., urgency, dysuria and nocturia ... for approx. 2 mo." The reason given for the consultation was that "patient is complaining of dysuria for the last 4 months." R. at 14.

On 1/7/67, it was noted that the appellant's "complaints have subsided" and a final diagnosis of "prostatitis-cystitis" was made. R. at 18.

B. The following excerpts from the Kaiser Permanente medical records show treatment sought and received at Kaiser by the appellant after service:

The 3/6/72 "clinic progress record" reported "urinating frequently and stinging". R. at 48.

The 5/5/72 "progress record" reported "urinary frequency". R. at 49.

The 9/21/72 "progress record" reported "urethral discharge × two days". R. at 50.

On 7/19/75, the appellant sought treatment for "discharge". R. at 52.

The 8/22/78 "progress record" reported complaints of "frequent urination". An impression of "? mild prostatitis" was noted. R. at 59.

The 11/26/78 and 11/30/78 "progress records" noted treatment for "discharge". R. at 60, 61.

The 12/2/78 "progress record" noted there was "no discharge" but "still burning". R. at 62.

"Discharge" was again noted in the "progress record" on 1/27/79 and 6/20/79. R. at 63, 65. Another undated "progress record" notation from 1979 reported "urinary discomfort × 2 days". R. at 64.

The 1/27/81 "progress record" reported "pt. has noted urethral discharge for the past two days". R. at 66.

The 9/1/82 "progress record" noted that the appellant complained of "burning ... discharge." R. at 82.

On 9/11/82, the appellant complained of "freq. urinat. × 3 d [days] and dysuria...." R. at 84.

On 9/21/83, a clinical physician noted "frequency and nocturia × 2 months". R. at 86.

A 5/27/83 consultant's report noted "frequency of urination × 5 mo. Not × 3." R. at 87.

A "urinary problem" was again noted by a clinical physician on 9/22/83. R. at 89.

On 11/25/85, a clinical physician noted "urgency, frequency, dysuria". He recorded an impression that the "prostate was slightly enlarged" and recommended a urology evaluation. R. at 90.

On 1/24/86, the "progress record" reported that the "prostate 2 × enlarged and mild tenderness". R. at 92.

On 2/7/86, "frequency" was reported again. R. at 93.

On 7/18/86, a voiding cystourethrogram was performed, resulting in an impression of "incontinence without demonstrable anatomical cause." R. at 31.

On 10/6/86, the appellant was started on Ditropan by a Dept. of Urology physician. R. at 33.

On 5/12/87, the appellant was examined by a Dept. of Urology physician who recorded that "the patient has noted recently that he has had increased daytime frequency every 30–45 minutes without leakage. He had nocturia times three." Ditropan was increased. He was also encouraged "to cut back on his fluids to help control his daytime frequency." R. at 36.

C. The following excerpts from VA medical records show a continuation of the

symptomatology revealed in the Kaiser Permanente records:

A VA genito-urinary examination was performed on 5/27/87. An assessment of "possible neurogenic bladder, or possible chronic interstitial cystitis" was made at that time. R. at 42.

VA outpatient medical records from 5/21/87 show that consultation from the Urology Dept. was requested because of "urinary frequency and nocturia × 3." R. at 101.

VA outpatient medical records from 6/29/87 noted "intermittent frequency 15–6 ×, nocturia × 3, urgency...." R. at 102.

VA outpatient medical records from 8/3/87 again reported "urgency", "frequency", "nocturia × 3". R. at 103.

VA outpatient medical records from 11/3/87 noted "frequency and mild urgency. Nocturia × 1–2, no dysuria." "Treated for prostatitis...." R. at 105.

D. The two private physicians' reports show:

The 4/5/88 report of Dr. Tamarin stated, "the patient currently has an inflamed prostate.... As the patient was treated for a similar condition in 1966, and since we know prostatitis is an entity with periods of exacerbation and remission, it is to me, within a reasonable doubt that the condition which he has currently may at first have appeared during the time the patient was in active duty in 1966–68." R. at 107.

The 4/8/88 report of Dr. Mansour noted symptoms which included "urgency, urgency incontinence, occasional dysuria, burning and urination." The impression was of "long standing problem of chronic prostatitis with acute exacerbation." R. at 112.